# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| OS33, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 4:17-CV-2603 CAS |
| v. | ) | |
| | ) | |
| CENTURYLINK COMMUNICATIONS, | ) | |
| L.L.C., and CENTURYLINK, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM AND ORDER</u>

This removed diversity matter is before the Court on remaining defendant CenturyLink Communications, L.L.C.'s ("CenturyLink") motion to dismiss plaintiff OS33's Petition ("complaint") under Rules 12(b)(6) and 9(b), Federal Rules of Civil Procedure.[1] Plaintiff opposes the motion and it is fully briefed. For the following reasons, the motion to dismiss will be granted in part and denied in part.

## I. Background

Plaintiff OS33 ("plaintiff") is a New York corporation that provides cloud network and storage services to its clients. Its principle place of business is in New York. Defendant CenturyLink is a Delaware corporation with its principle place of business in Louisiana. Compl. ¶¶ 1-2.

In June 2011, plaintiff entered into a Master Services Agreement ("MSA") with nonparty Savvis Communications Corporation ("Savvis"), under which Savvis would provide certain services to plaintiff related to computer hardware, maintenance, and storage services. Id. ¶ 5. Savvis

---

[1]Plaintiff voluntarily dismissed its claims against defendant CenturyLink, Inc. without prejudice on December 8, 2017. (See Doc. 12.)

underwent corporate restructuring and a name change, and transferred to CenturyLink its accounts receivable for plaintiff and the obligation to provide plaintiff the computer-related services. Following the transfer, CenturyLink provided services to plaintiff under the MSA starting in 2011. Id. ¶¶ 6-8, 12.

The services CenturyLink provided were also governed by a Savvis Service Schedule and any subsequent Service Orders or Statements of Work outlining services to be performed for plaintiff under the MSA, as set forth in any such Service Order or Statement of Work. Id. ¶¶ 11-12; Ex. A., MSA at A1, ¶ 1. Under the terms of the Savvis Service Schedule, the Term of Service of any Service provided under the Service Orders is defined as:

> **2. Term**. Services have a minimum term which begins on the Billing Commencement Date ("BCD") and continues for the period set forth in the relevant Service Order or SOW (the "Initial Term"), at the conclusion of which, the Service will automatically renew for successive periods equal to the Initial Term, unless terminated by either party in writing at least 60 days prior to the expiration of the then-current Service Term. The Initial Term and any renewal terms are collectively referred to as the "Service Term".

Id. ¶ 13; Ex. B, Savvis Service Schedule at B1, ¶ 2.[2] The Savvis Service Schedule further provides that every service provided has its own Billing Commencement Date that is independently applicable, and the Billing Commencement Date of any service shall not affect that of any other Service. Id. ¶ 14; Ex. B, Savvis Service Schedule at B1, ¶ 3.

Under the parties' MSA, if a customer terminates any Service after the Billing Commencement Date but prior to the conclusion of the Service term, for any reason other than cause, or if CenturyLink terminates during that time frame for cause,

---

[2]Plaintiff's Exhibit B consists of two sequentially numbered documents. The first is a Savvis Service Schedule addressing Hosting Services and Security Services (Ex. B at B1-B2), and the second is a Savvis Service Schedule addressing Colocation Services (Ex. B at B3-B6). Exhibit B is collectively referred to as the "Service Schedules."

then Customer shall be liable for: (a) an early termination charge equal to 50% of the then current [Monthly Recurring Charge] for the affected Services multiplied by the number of months remaining in the Service term; (b) Service charges accrued but unpaid as of the termination date; and (c) any out-of-pocket costs incurred by or imposed upon Savvis (e.g., ordered equipment, licenses, carrier termination charges). The parties agree that any cancellation fees and early termination charges set forth in the Agreement constitute liquidated damages and are not a penalty. If a particular Service is terminated upon which another service is dependent, all such dependent services shall be deemed to be terminated as well.

Id. ¶¶ 15-16; Ex. A, MSA at A2, ¶ 6.

In August 2016, plaintiff requested the termination of certain Services which it no longer required, as being unneeded or obsolete. Id. ¶ 17. CenturyLink advised plaintiff that cancellation of the Services would result in Early Termination Charges of $626,133.82, and stated it determined this amount was due by taking 50% of the Monthly Recurring Charges on each Service and multiplying each by the number of months remaining in the Service Term. Id. ¶¶ 18-19. After being advised of the Early Termination Charges, plaintiff requested that CenturyLink not terminate the Services. Despite plaintiff's request, CenturyLink terminated the Services and has claimed that plaintiff is responsible for the alleged Early Termination Charges. Id. ¶¶ 20-21.

Plaintiff alleges that the "Service Terms for the Services are incorrect because [CenturyLink] would improperly restate the Billing Commencement Date's [sic] for services any time a change was made to a Service Order by the Parties." Id. ¶ 23. "For example, if an upgrade was made to a leased server on July 1, 2015, with a Service Term of 36 months, and a Billing Commencement Date of January 1, 2013, [CenturyLink] would change the Billing Commencement Date for the 36 month Service Term for the server lease to being July 1, 2015 – effectively changing the Service Term from 36 months to 54 months." Id. ¶ 24.

Plaintiff alleges that CenturyLink "would further change the date of the Billing Commencement Date for calculating the Service Term without advising Plaintiff of this change, and

without issuing a new written Service Order." Id. ¶ 25.  Plaintiff claims that by "failing to issue new Service Orders showing the Change in the Billing Commencement Date for the Service, [CenturyLink] made it impossible for Plaintiff to track the Service terms for the various Services which it requested [CenturyLink] to supply pursuant to MSA." Id. ¶ 26.  Finally, plaintiff alleges that "by failing to issue new Service Orders showing the Change in the Billing Commencement Date for the Service, Plaintiff never agreed in writing to any change in the Billing Commencement Date or Service Term regarding any Services provided by [CenturyLink]." Id. ¶ 27.

Count I of the complaint seeks a declaratory judgment that (1) CenturyLink violated the MSA and the Service Schedule by changing the Service Term and Billing Commencement Dates for Services, without notice to plaintiff, whenever there was a change to the original Service Order; (2) CenturyLink lacked cause to terminate Services it was providing to plaintiff after plaintiff withdrew its request for early termination; (3) CenturyLink's claim for early termination charges is improper based on its breach of the parties' agreement by terminating Services without cause, and due to its improper change in the Service Terms without notice to plaintiff; and (4) plaintiff does not owe any early termination charges for Services that were cancelled by CenturyLink. Id. at 7.

Count II is a claim for common law fraud.  Plaintiff alleges that CenturyLink changed the Billing Commencement Date for Services being provided, without notice to plaintiff, any time the parties made a change to the Service.  Plaintiff asserts that changing the Billing Commencement Date altered the Service Term under the original Service Order, and CenturyLink knew that by making this change it was changing the date upon which any Service would end or auto renew, and therefore was changing the terms of the Service Orders between the parties. Id. ¶¶ 38-41.  Plaintiff

alleges CenturyLink knew the parties' Agreement[3] "did not allow for the Service Term to be changed, as the Agreement only provided for the Service Term to be renewed," but CenturyLink "represented to Plaintiff the remaining terms for various services which were cancelled based upon these improperly altered changed dates." Id. ¶¶ 42-43. Plaintiff alleges that CenturyLink "represented these false and incorrect dates to Plaintiff with the intention that Plaintiff rely upon them in paying" early termination charges, although CenturyLink knew its representation of the charges was "based upon false and incorrect Service Term dates." Id. ¶¶ 44-45. Plaintiff alleges that CenturyLink intended for it to rely on the representations, which plaintiff did not know were false when made, and plaintiff relied on the representations. Id. ¶¶ 46-48.

CenturyLink moves to dismiss both counts of the complaint for failure to state a claim upon which relief can be granted.

## II.  Legal Standard

The purpose of a motion to dismiss for failure to state a claim is to test the legal sufficiency of the complaint. To survive a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim for relief "must include sufficient factual information to provide the 'grounds' on which the claim rests, and to raise a right to relief above a speculative level." Schaaf v. Residential Funding Corp., 517 F.3d 544, 549 (8th Cir. 2008) (citing Twombly, 550 U.S. at 555 & n.3). This obligation requires a

---

[3]The complaint does not define the capitalized term "Agreement," but the MSA provides that the parties' "Agreement" consists of the "MSA plus all applicable Service Schedules, Savvis Service Guides, Service Orders, Statements of Work ("SOWs"), service level agreements ("SLAs") and any other documents that are expressly incorporated herein . . . ." Ex. A at A1, § 1. The Court's use of the term "Agreement" incorporates the MSA's definition.

plaintiff to plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555.

On a motion to dismiss, the Court accepts as true all of the factual allegations contained in the complaint, even if it appears that "actual proof of those facts is improbable," id. at 556, and reviews the complaint to determine whether its allegations show that the pleader is entitled to relief. Id. at 555-56; Fed. R. Civ. P. 8(a)(2). The principle that a court must accept as true all of the allegations contained in a complaint does not apply to legal conclusions, however. Iqbal, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice").

While courts are generally to consider only the complaint's allegations in reviewing a Rule 12(b)(6) motion, they may consider documents "necessarily embraced by the complaint" without converting a motion to dismiss into a motion for summary judgment. Ryan v. Ryan, 2018 WL 2089793, at *3 (8th Cir. May 7, 2018). This category includes "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." Id. (quoted case omitted). Here, the complaint refers to two exhibits it states are attached, a Master Services Agreement and a Savvis Service Schedule, Complaint ¶¶ 5, 11, but no exhibits were filed with the complaint. CenturyLink filed copies of these exhibits with its memorandum in support of the motion to dismiss, and plaintiff attached the same two exhibits to its memorandum in opposition. The Court finds the two exhibits are necessarily embraced by the complaint and are properly considered on the motion to dismiss.

### III. Discussion

#### A. Count I – Declaratory Judgment/Breach of Contract

As a threshold matter, plaintiff argues in its opposition that the motion to dismiss must be denied because Count I states a cause of action under the Missouri Declaratory Judgment Act. (Doc. 19 at 6-7.) This argument is not well taken. Although plaintiff brought this action in state court under the Missouri Declaratory Judgment Act, the state act is a procedural remedy that does not control in federal court, and upon removal the case becomes governed by the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-02. G.S. Robins & Co. v. Alexander Chem. Corp., 2011 WL 1431324, at *4 n.1 (E.D. Mo. Apr. 14, 2011). "The Federal Rules of Civil Procedure apply to declaratory judgment actions, see Fed. R. Civ. P. 57, and thus the plaintiff[] must comply with the pleading requirements of Rule 8(a)[.]" Karnatcheva v. JPMorgan Chase Bank, N.A., 704 F.3d 545, 547 (8th Cir. 2013). "[I]t is well settled that the [federal] declaratory judgment statute is strictly remedial in nature and does not provide a separate basis for subject matter jurisdiction." First Fed. Sav. & Loan Ass'n of Harrison, Ark. v. Anderson, 681 F.2d 528, 533 (8th Cir. 1982). "A successful action for declaratory judgment requires a viable underlying cause of action." Essling's Homes Plus, Inc. v. City of St. Paul, Minn., 356 F.Supp.2d 971, 984 (D. Minn. 2004). Consequently, where a plaintiff's underlying substantive claim fails, its request for declaratory judgment fails as well. Salau v. Denton, 139 F.Supp.3d 989, 1012 (W.D. Mo. 2015).

In Count I, plaintiff seeks a declaratory judgment regarding construction of the Agreement between the parties regarding the calculation of Early Termination Charges and CenturyLink's change of the Billing Commencement Date for Services. Compl. ¶ 33. Plaintiff asserts that by changing the BCD for Services, failing to give notice of changes to the BCDs, and refusing to accept plaintiff's withdrawal of its early termination request, CenturyLink has breached the parties'

Agreement.  Id. ¶ 35.  The Court therefore examines Count I to determine whether plaintiff adequately pleads an action for breach of contract.

In a diversity action, state law governs the rules for construing contractual agreements. Orion Fin. Corp. of S. Dak. v. American Foods Group, Inc., 281 F.3d 733, 738 (8th Cir. 2002).  The parties agree that Missouri law governs this action.[4]  In determining the scope of Missouri law, the Court is bound by the decisions of the Missouri Supreme Court.  Taylor v. St. Louis County Bd. of Election Comm'rs, 625 F.3d 1025, 1027 (8th Cir. 2010).  Decisions from the Missouri Court of Appeals are also relevant and "must be followed when they are the best evidence of Missouri law." Id. at 1028, n.2 (quoting Bockelman v. MCI Worldcom, Inc., 403 F.3d 528, 531 (8th Cir. 2005)).

Under Missouri law, the essential elements of a breach of contract action are: "(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." Keveney v. Missouri Military Acad., 304 S.W.3d 98, 104 (Mo. 2010) (en banc).  A plaintiff must "identify which rights or obligations [the defendant] breached under the contract in order to establish a claim for breach of contract."  Lucero v. Curators of Univ. of Mo., 400 S.W.3d 1, 5 (Mo. Ct. App. 2013) (quotation and citation omitted)

In Missouri, the interpretation of a contract is a question of law.  Leggett v. Missouri State Life Ins., 342 S.W.2d 833, 850 (Mo. 1960) (en banc).  The "cardinal principle for contract interpretation is to ascertain the intention of the parties and to give effect to that intent."  Butler v. Mitchell–Hugeback, Inc., 895 S.W.2d 15, 21 (Mo. 1995) (en banc) (citing Royal Banks of Missouri v. Fridkin, 819 S.W.2d 359, 362 (Mo. 1991) (en banc)).  It is presumed that the natural and ordinary meaning of the language used expresses the intent of parties to a contract.  J.E. Hathman, Inc. v.

_____

[4]See MSA at A3, ¶ 11.

8

Sigma Alpha Epsilon Club, 491 S.W.2d 261, 264 (Mo. 1973) (en banc). Accordingly, "In interpreting a contract, [courts] must use the plain, ordinary, and usual meaning of the contract's words and consider the whole document." Butler, 895 S.W.2d at 21 (citing Royal Banks, 819 S.W.2d at 362). In a situation where the contract consists of multiple documents, as here, all of the "documents must be read to capture what was intended." Butler, 895 S.W.2d at 21.

Where a written contract is unambiguous and complete on its face, parol evidence may not be introduced to vary or contradict the terms of the agreement. J.E. Hathman, Inc., 491 S.W.2d at 264. A contract is ambiguous only when its terms are reasonably susceptible of more than one meaning. Id. A contract is not ambiguous merely because the parties disagree as to its meaning. Id. Here, neither party asserts that the Agreement is ambiguous.

CenturyLink moves to dismiss Count I for failure to state a claim upon which relief can be granted. CenturyLink asserts that the complaint and exhibits fail to state a claim because (1) the complaint and exhibits demonstrate that CenturyLink complied with the terms of the parties' Agreement, both in applying new Billing Commencement Dates each time plaintiff ordered a new or upgraded Service, and in effectuating plaintiff's early termination request, and (2) plaintiff agreed to pay termination charges.

  1.  *Plaintiff's Claim that CenturyLink Breached the Parties' Agreement by Improperly Restarting Billing Commencement Dates*

CenturyLink moves to dismiss plaintiff's claim in Count I that it breached by Agreement by improperly restarting Billing Commencement Dates ("BCDs"). CenturyLink contends that based on the terms of the Agreement itself, plaintiff cannot state a claim for relief in Count I. CenturyLink argues that under the express terms of the Agreement, it properly started new BCDs each time plaintiff ordered or upgraded a Service, and no provision of the Agreement required it to give

plaintiff any further notice of the Service orders and upgrades that plaintiff itself initiated, and of which plaintiff therefore had full knowledge.

CenturyLink states that contrary to the Agreement's terms, plaintiff pleads CenturyLink improperly restarted the Billing Commencement Date for upgrades made pursuant to Service Orders, did not advise plaintiff of the changes, and made it "impossible for [plaintiff] to track" the Service Terms. Compl. ¶¶ 23-26. CenturyLink contends the Agreement invalidates plaintiff's allegations because under the Agreement's terms, a Service Order is a request for Services ordered on a "form . . . signed by Customer," Ex. A at A4, § 18, and plaintiff does not plead that CenturyLink initiated any upgrades on its own initiative. Therefore, CenturyLink contends that under the Agreement plaintiff would have requested, via a Service Order, any upgrades to existing Services. Ex. A at A4, § 18. Thus, CenturyLink argues plaintiff necessarily had control over and knowledge of the frequency, timing, quantity, quality, and cost of any changes it made to Service Orders.

Plaintiff responds that the issue is not whether CenturyLink commenced BCDs upon receipt of a Service Order when a Service was purchased or upgraded, but rather that CenturyLink "changed the BCD for existing services when a new upgraded service was requested on top of the already existing service. Complaint at 23, 24." Mem. Opp. at 8. Plaintiff acknowledges that every Service Order has its own BCD, and that the BCDs are independent of the BCD under any other Service Order. Plaintiff states its complaint is not that CenturyLink was assigning a BCD upon receipt of a Service Order for a new or upgraded service: "Instead, the issue is that in addition to assigning a new BCD to the new Service Order, [CenturyLink] was then going back and changing the BCD for services which were already existing under a separate, independent Service Order. Therefore, if [plaintiff] would issue a Service Order for an additional security measure for a server already leased under a separate Service Order, not only would CenturyLink assign a BCD for the upgraded

additional security measure, but it would then change the BCD for the already existing security being provided for that server to match the most recent date." Id. at 8-9. Plaintiff asserts that this action in effect changed the terms of every Service Order by adding time to the length of the contract without notice.

Plaintiff further responds that no language in the Agreement allowed CenturyLink to change the BCDs for any Service, and contends that the Agreement states the opposite: "Services have a minimum term which begins on the Billing Commencement Date and continues for the period set forth in the relevant Service Order." Ex. B at B1, § 2. Plaintiff asserts that despite a term or period of 24 or 36 months for a service as stated in Service Orders issued for Services, by changing the BCD as alleged in paragraphs 23 and 24 of the complaint, CenturyLink violated the plain language of the Agreement and has not complied with its terms.

CenturyLink replies that plaintiff's complaint is based on the central allegation that CenturyLink improperly restarted BCDs for Services that plaintiff requested to be updated or changed, Complaint ¶¶ 23-24, but the Agreement's terms demonstrate that CenturyLink's actions were in compliance therewith. CenturyLink states that plaintiff's opposition concedes CenturyLink may initiate new BCDs for upgraded services that plaintiff requested, and therefore the claim in Count I should be dismissed.

CenturyLink also replies that plaintiff's opposition improperly alleges facts which are not in its complaint, and constitutes an attempt to informally amend the complaint that should not be permitted. Specifically, CenturyLink states that the complaint alleges CenturyLink improperly changed Billing Commencement Dates for Services that plaintiff requested to be upgraded or changed, Complaint ¶ 23, and provides as an example: "[I]f an upgrade was made to a *leased server* on July 1, 2015, with a Service Term of 36 months, and a Billing Commencement Date of January

1, 2013, Defendants would change the Billing Commencement Date for the 36 month Service Term for the *server lease* to being July 1, 2015 – effectively changing the Service Term from 36 months to 54 months." Compl. ¶ 24 (emphasis added.) It states that plaintiff does not allege in the complaint that CenturyLink changed BCDs for Services that plaintiff did not request to be upgraded or changed.

CenturyLink asserts that plaintiff's opposition, however, changes the complaint's allegations and now asserts that "if [plaintiff] were to request a change or upgrade to an existing service through a new Service Order, that not only would this new Service Order be assigned a BCD, but *any prior service associated with that order would have its BCD changed to a new date to match the new service order*." Mem. Opp. at 2, citing Compl. ¶ 23 (emphasis added.) Plaintiff's opposition contends that "CenturyLink changed the BCD for existing services when a new upgraded service was requested on top of the already existing service." Id. CenturyLink asserts that the Court should disregard these unpled "facts" because the complaint does not make such factual allegations.

CenturyLink is correct that a plaintiff's allegations in its opposition are significantly different from the allegations in its complaint. Plaintiff cannot change or add to the factual allegations in its complaint by including them in its opposition to the motion to dismiss. Country Mutual Ins. Co. v. Cronin, 2013 WL 1282333, at *6 (E.D. Mo. Mar. 26, 2013) (citing Morgan Distrib. Co., Inc. v. Unidynamic Corp., 868 F2d 992, 995 (8th Cir. 1989) ("[I]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss. To hold otherwise would mean that a party could unilaterally amend a complaint at will, even without filing an amendment, . . . simply by raising a point in a brief.") (internal citations omitted)).

The Court therefore examines the complaint as pleaded. The operative allegations with respect to the Billing Commencement Dates are in paragraphs 23 and 24, which allege:

23. The Service Terms for the Services are incorrect because Defendants would improperly restart the Billing Commencement Date's [sic] for services any time a change was made to a Service Order by the parties.

24. For example, if an upgrade was made to a leased server on July 1, 2015, with a Service Term of 36 months, and a Billing Commencement Date of January 1, 2013, Defendants would change the Billing Commencement Date for the 36 month Service Term for the server lease to being July 1, 2015 – effectively changing the Service Term from 36 months to 54 months.

Compl. at 5, ¶¶ 23-24.

The complaint's example of CenturyLink's alleged breach describes a Service Order for a leased server with a 36-month term, beginning on January 1, 2013, which term would have ended January 1, 2016 but for the fact that plaintiff ordered an upgrade to the leased server on July 1, 2015, 30 months into the 36-month term. Plaintiff alleges that CenturyLink changed the Billing Commencement Date for the leased server to July 1, 2015, thus starting a new 36-month term that would end on July 1, 2018. Plaintiff alleges this was a breach of the Agreement because it effectively changed the term of the original Service Order from 36 months to 54 months.[5]

Plaintiff concedes in its opposition that under the parties' Agreement, it was proper for CenturyLink to start a new BCD when plaintiff requested a new or upgraded Service Order. Mem. Opp. at 8. Plaintiff asserts instead that its allegation is that CenturyLink "changed the BCD for existing services when a new upgraded service was requested on top of the already existing service." Id., citing Compl. ¶¶ 23, 24. Plaintiff explains:

─────────────

[5]If CenturyLink started a new 36-month term for the server lease on July 1, 2015, this would actually result in a 66-month term for the original Service Order, as 30 months of the original 36-month term would have passed on July 1, 2015. The Court assumes this is simply an error in the complaint. Plaintiff's allegation as to a 54-month term would be correct if the upgrade was requested when 24 months, rather than 30 months, of the original Service Order had passed. The error does not change the analysis, and the Court uses plaintiff's 54-month term for purposes of its discussion.

> [T]he issue is that in addition to assigning a new BCD to the new Service Order, [CenturyLink] was then going back and changing the BCD for services which were already existing under a separate, independent Service Order. Therefore, if [plaintiff] would issue a Service Order for an additional security measure for a server already leased under a separate Service Order, not only would CenturyLink assign a BCD for the upgraded additional security measure, but it would then change the BCD for the already existing security being provided for that server to match the most recent date. This action in effect changed the terms of every service order by adding time to the length of the contract without notice.

Id. at 8-9. Thus, plaintiff's argument in its opposition is that CenturyLink not only extended the BCD for the original server lease as alleged in the Complaint – which it concedes CenturyLink could do under the Agreement – but also that CenturyLink breached the parties' Agreement because it added a new, separate BCD for the same leased server.

The problem with plaintiff's argument is that its complaint does not plead any facts to support this theory of breach of contract against CenturyLink. Plaintiff's complaint alleges only that CenturyLink took action plaintiff now concedes it was authorized to take under the parties' Agreement; i.e., CenturyLink established a new Billing Commencement Date whenever plaintiff submitted a Service Order for an upgraded or additional Service. Plaintiff cannot amend the allegations of its complaint by means of its memorandum in opposition. See Morgan Distrib., 868 F2d at 995. Plaintiff therefore fails to plead sufficient facts to establish a necessary elements of its case, a breach of the contract by CenturyLink in connection with improperly restarting new Billing Commencement Dates. See Keveney, 304 S.W.3d at 104.

CenturyLink's motion to dismiss Count I with respect to plaintiff's claim for breach of contract with respect to its allegations concerning restarting Billing Commencement Dates will be granted, and this claim will be dismissed.

## 2. Plaintiff's Claim that CenturyLink Breached the Parties' Agreement by Failing to Issue a New Written Service Order and Provide Notice When Changing BCDs

CenturyLink moves to dismiss plaintiff's claim in Count I that it breached the Agreement by changing the Billing Commencement Dates for Services "without advising Plaintiff of this change, and without issuing a new written Service Order." Compl. ¶ 25. CenturyLink asserts that the Agreement did not require it to give plaintiff any further notice of the Service Orders and upgrades that plaintiff itself initiated, and of which plaintiff therefore had full knowledge. CenturyLink contends that based on the terms of the Agreement itself, plaintiff cannot state a claim for breach of contract for lack of notice.

Specifically, CenturyLink states that contrary to plaintiff's assertions it did not provide "notice" that Service Terms and BCDs changed each time plaintiff ordered a new or upgraded Service, e.g., Complaint ¶¶ 25-27, 38, the Agreement explains that each Service has its own BCD. Ex. A at A1, §3.1; Ex. B at B1, §3; Ex. B at B3, §4. CenturyLink states that plaintiff does not and cannot allege it had a duty to provide plaintiff any other "notice," because the Agreement expressly gives plaintiff control over the "type and details of the specific services ordered by" it. Ex. A at A4, § 18 (definitions of "Service" and "Service Order").

Plaintiff responds that CenturyLink's argument concerning notice ignores the Agreement's requirement that CenturyLink give notice when there was a Service Order or upgrade. Plaintiff cites the Savvis Service Schedules as stating "that the BCD for a service is the date [CenturyLink] notifies the customer in writing that the initial installation is complete, or for security services, when there is notice the service is installed." Mem. Opp. at 9, citing Ex. B. Plaintiff argues that contrary to CenturyLink's claim it is not required to provide any notice when a BCD is assigned pursuant to a Service Order for new or upgraded Service, the BCD date is determined by when CenturyLink provides notice the Service has commenced. Plaintiff asserts, "Clearly this notice requirement

15

would extend to any time an existing BCD was changed or altered, for otherwise, how can a customer of [CenturyLink] track the BCDs for all its services" and know when the services are to expire so they can be cancelled without incurring early termination charges. Id. at 10.

CenturyLink states that the Agreement's terms disprove plaintiff's claim it was "impossible" to track BCDs because CenturyLink allegedly "failed" to issue new Service Orders after commencing new BCDs for changed or upgraded Services. Compl. ¶ 26; Mem. Opp. at 3. It states that under the Agreement, a Service Order is a customer request for Services or upgrades or changes to Services. Ex. A at A4, § 18 (definition of "Service Order"). Any new Service Order would therefore come from plaintiff, not CenturyLink. The fact that CenturyLink did not initiate new Service Orders is therefore appropriate under the Agreement, and it contends that because plaintiff initiated new Service Orders, plaintiff had control over the frequency, timing, quantity, quality, and cost of any changes it made to Service Orders. Ex. A at A4, § 18. CenturyLink also states that contrary to plaintiff's assertion, the Agreement does not require written notification for all changes to all types of Services.

With respect to the issue of notice, the complaint alleges the following:

> 25. [CenturyLink] would further change the date of the Billing Commencement Date for calculating the Service Term without advising Plaintiff of this change, and without issuing a new written Service Order.

> 26. By failing to issue new Service Orders showing the Change in the Billing Commencement Date for the Service, [CenturyLink] made it impossible for Plaintiff to track the Service terms for the various Services which it requested [CenturyLink] to supply pursuant to [the] MSA.

> 27. Further, by failing to issue new Service Orders showing the Change in the Billing Commencement Date for the Service, Plaintiff never agreed in writing to any change in the Billing Commencement Date or Service Term regarding any Services provided by [CenturyLink].

Compl. at 5.  The relevant portion of Count I's prayer for relief asks the Court to enter an order finding that:

> a. [CenturyLink] violated the MSA and Service Schedule between the parties by changing the Service Term and Billing Commencement Date's [sic] for services without notice to Plaintiff whenever there was [a] change to the original Service Order[.]

Compl. at 7.

The Agreement's terms define a Service Order as a "request submitted on a form issued by [CenturyLink] and signed by Customer that includes the type and details of the specific Services ordered by Customer."  Ex. A at A4, § 18 (definition of "Service Order").  Plaintiff does not allege that CenturyLink provided new or upgraded services without plaintiff's request to do so.  As a result, any new Service Order would be initiated and signed by plaintiff, not CenturyLink.  No term in the Agreement states that CenturyLink will issue a Service Order.  Therefore, the complaint's factual allegations in paragraphs 25 through 27, that CenturyLink did not issue new Service Orders, do not allege a breach of the parties' Agreement.  For the same reason, plaintiff's allegation that it did not agree in writing to any change in the Billing Commencement Dates or Service Terms is contrary to the Agreement's terms and does not allege a breach of the contract by CenturyLink.  It also ignores the Agreement's terms that provide all Service Orders are to be signed by the Customer, plaintiff.

The complaint specifically alleges it was CenturyLink's failure to issue new Service Orders that made it "impossible" for plaintiff to track the Service terms for the various Services it requested.  Compl. ¶ 26.  Where CenturyLink had no contractual obligation to issue new Service Orders, and it was plaintiff that submitted signed Service Orders, CenturyLink cannot be held responsible for plaintiff's inability to track the Service terms for Services that it requested.  Plaintiff's complaint therefore fails to allege facts sufficient to establish a plausible claim that CenturyLink breached the parties' Agreement by failing to provide notice by issuing new Service Orders.

Plaintiff's argument in its opposition that CenturyLink had an obligation under the Agreement to provide it notice that a service had commenced, as the BCD date was determined by when CenturyLink provided such notice, is not supported by facts pleaded in the complaint and therefore cannot establish a plausible claim for breach of contract. The complaint's factual allegations as to notice are grounded exclusively on CenturyLink's alleged failure to issue written Service Orders, which the Agreement does not obligate CenturyLink to do. The complaint does not allege any facts that plaintiff signed Services Orders pursuant to which CenturyLink was required to provide notice of installation, but failed to do so. As with its claim concerning restarting the Billing Commencement Dates, plaintiff cannot amend its complaint to add new factual allegations concerning notice by means of its memorandum in opposition. See Morgan Distrib., 868 F2d at 995. Plaintiff therefore fails to plead facts to establish a necessary element of its case, a breach of the contract by CenturyLink by failing to give notice by issuing new Service Orders. See Keveney, 304 S.W.3d at 104.

Plaintiff's argument also fails to recognize that the Agreement calls for CenturyLink to provide written notice of installation only under certain limited circumstances, none of which are pleaded in the complaint. The Agreement provides that billing begins on the Billing Commencement Date, as defined in the applicable Service Schedule. Ex. A at A1, § 3.1. For Hosting Services, "The BCD is the date that [CenturyLink] notifies the Customer in writing that the initial installation is complete. If a particular Service does not require "installation", the BCD will be the date on which [CenturyLink] begins providing such Service." Ex. B at B1 (Service Type #1: Hosting Services). Thus, for Hosting Services, CenturyLink was only required to notify plaintiff in writing that the *initial installation* was complete to trigger the BCD. If a particular Service did not require "installation," the BCD would be the date on which CenturyLink began providing the

Service, and the Agreement has no notice requirement. Plaintiff' complaint does not allege facts that CenturyLink did not notify it in writing of any initial installation of Hosting Services.

For Security Services, "The BCD for Services is the date [CenturyLink] notifies Customer that the Service is installed, configured, and ready to enter 'active' status." Ex. B at B1 (Service Type #2: Security Services). The Agreement does not require written notice, and plaintiff's complaint does not allege any facts that CenturyLink did not notify it when any Security Services were installed, configured, and ready to enter service.

Finally, for Colocation Services, "the BCD for the Service is the earlier of (i) the date on which Customer uses (except during the Acceptance Period) the Service or (ii) the date [CenturyLink] notifies Customer in writing that the Initial Installation or a usable part thereof (such as a data circuit between two points or an individual data center installation on a multi-data center project) is complete." Ex. B at B3, § 4. Under the first option, plaintiff would necessarily know when it began using a Service, and that such use would trigger the BCD under the Service Schedule's terms. The second option applied only to initial installations or a usable part thereof, and the complaint does not allege any facts that CenturyLink did not notify plaintiff in writing when any initial installation of Colocation Services, or a usable part thereof, was complete.

For these reasons, the complaint's allegations that CenturyLink changed BCDs and Service Terms without notice to plaintiff by failing to issue new written Service Orders are not supported by the parties' Agreement and fail to include sufficient factual information to provide the grounds on which plaintiff's breach of contract claim rests, and to raise a right to relief above a speculative level. See Twombly, 550 U.S. at 555 & n.3. CenturyLink's motion to dismiss plaintiff's breach of contract claim based on failure to issue new written Service Orders will therefore be granted.

### 3. Plaintiff's Claim that CenturyLink Breached the Agreement by Failing to Permit Plaintiff to Rescind its Termination Notice

CenturyLink moves to dismiss plaintiff's final claim in Count I, that it breached the Agreement when it failed to give effect to plaintiff's request to withdraw its early termination of certain services, and imposed an Early Termination Charge of $626,133.82. CenturyLink argues that plaintiff fails to state a claim upon which relief can be granted because it cannot point to any duty under the Agreement that CenturyLink give effect to plaintiff's attempt to withdraw its early termination request. CenturyLink asserts that it complied with the Agreement when it terminated services at plaintiff's request. In support, CenturyLink cites the MSA's provision that "[i]f a particular Service is terminated upon which another service is dependent, all such dependent services shall be deemed to be terminated as well," Ex. A at A2, § 6; and the Savvis Service Schedule for Colocation Services's provision that CenturyLink "shall have the right to terminate any or all of the Services without liability of any kind on the . . . expiration or earlier termination of this Service Schedule." Ex. B at B5.

Plaintiff responds that under the Agreement's terms, the event that triggers the application of Early Termination Charges is not a notice or request to cancel services, but the actual termination of services. It cites the Agreement's provision that, if "after the BCD but prior to the conclusion of the applicable Service term, the Service or this Agreement *is terminated* either by [CenturyLink] for cause or by Customer for any reason other than cause, then Customer shall be liable for" Early Termination Charges. Mem. Opp. at 10, citing Ex. A, ¶ 3.1[6] (emphasis added). Plaintiff says its complaint alleges that before any services were terminated by CenturyLink, it asked to withdraw

---

[6]The language plaintiff quotes is from Paragraph 6 of Exhibit A. The reference to Paragraph 3.1 appears to be a drafting error.

the request for early termination of services, but CenturyLink proceeded to terminate services and assessed Early Termination Charges despite the withdrawal request.

Plaintiff concedes there is no language in the Agreement that affirmatively grants a customer the right to withdraw a termination request before a Service is in fact terminated, but it asserts there is nothing in the Agreement stating such a request cannot be withdrawn. Plaintiff contends the Agreement's terms imply that a request for termination of services can be withdrawn, as it provides that Early Termination Charges are calculated from the date Services are *terminated*, not from the date a request for Services is received. Plaintiff asserts that because it asked CenturyLink to withdraw its request for termination prior to the time services were terminated, there was no request to terminate services pending at the time CenturyLink terminated the services. Plaintiff argues that as a result, the termination was solely done at CenturyLink's discretion, but CenturyLink can only impose Early Termination Charges under Paragraph 6 if it terminates services for cause.

In pertinent part, the complaint alleges as follows: Plaintiff requested CenturyLink to terminate certain services in August 2016, but then asked CenturyLink not to terminate the services after it advised plaintiff that cancellation would result in Early Termination Charges of $626,133.82. Compl. ¶¶ 17-20. Despite plaintiff's asking to withdraw the request for termination, CenturyLink terminated the services and claimed plaintiff was responsible for the Early Termination Charges. Id. ¶ 21. CenturyLink could only terminate Services before the end of the Service Term for Cause. Id. ¶ 16. The complaint seeks declarations that CenturyLink breached the parties' Agreement when it terminated services after plaintiff withdrew its request for early termination, because CenturyLink did not have cause to terminate services and, as a result, plaintiff is not liable for the Early Termination Charges. Compl. at 7.

The Agreement is silent as to the possibility or effect of a customer's request to withdraw a request for termination of services. The portions of the MSA and Savvis Service Schedule cited by CenturyLink do not establish that it had the right to refuse to accept plaintiff's request to withdraw its early termination request and could then impose Early Termination Charges.[7] Plaintiff's position that it is only liable for Early Termination Charges under the Agreement where it actually terminates services finds some support in the language of Paragraph 6 of the MSA, and in the complaint's factual allegations that plaintiff asked to withdraw the termination request prior to CenturyLink's termination of any Services, but CenturyLink refused to honor the request and proceeded to terminate Services on its own in the absence of cause.

The Court therefore concludes that plaintiff's complaint contains sufficient factual matter to state a claim for breach of contract that is plausible on its face, based on CenturyLink's actions in refusing to honor plaintiff's request to withdraw the early termination request and in imposing Early Termination Charges. CenturyLink's motion to dismiss this aspect of plaintiff's declaratory judgment/breach of contract claim in Count I will be denied.

B. Count II – Fraud

Count II of the complaint asserts a claim for fraud based on CenturyLink's actions in changing the Billing Commencement Dates for Services provided to plaintiff "without notice to Plaintiff any time a change to the Service was made by the parties," thus altering the Service Term under the original Service Order. Compl. ¶¶ 38-39. The complaint alleges CenturyLink knew that by changing the BCDs without notice to plaintiff, it was changing the date upon which any Service would end or auto renew; that CenturyLink knew the Agreement did not allow the Service Term to be changed; and that it represented to plaintiff remaining terms for terminated services based on

_____

[7]Exhibit A at A2, § 6; Exhibit B at B5.

improperly changed dates with the intent that plaintiff rely upon them in paying Early Termination Charges, knowing that its representation of the Early Termination Charges to plaintiff was based on false and incorrect Service Term dates. Compl. ¶¶ 40-50.

CenturyLink moves to dismiss Count II for failure to state a claim on the grounds that (1) CenturyLink's compliance with the Agreement cannot constitute fraud, (2) the economic loss doctrine bars plaintiff's fraud claim, and (3) plaintiff fails to plead fraud with particularity.

The elements of an action for fraud under Missouri law are: "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted on by the person in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury." Renaissance Leasing, LLC v. Vermeer Mfg. Corp., 322 S.W.3d 112, 131-32 (Mo. 2010) (en banc). A state law fraudulent misrepresentation claim must "comply with the heightened pleading standards of Rule 9(b), which require plaintiffs to plead 'the circumstances constituting fraud . . . with particularity.' Fed. R. Civ. P. 9(b)." BJC Health Sys. v. Columbia Cas. Co., 478 F.3d 908, 917 (8th Cir. 2007).

In Count II, plaintiff attempts to transform a breach of contract claim into a fraud claim, as the fraud claim is based on the same factual allegations that form the basis of plaintiff's first two declaratory judgment/breach of contract claims in Count I. The Court has concluded that plaintiff's complaint fails to state a claim for breach of contract based on CenturyLink's alleged improper restarting of Billing Commencement Dates, infra at 14, and its failure to issue new written Service Orders and provide notice when changing BCDs, infra at 19.

Plaintiff therefore does not allege facts that plausibly state a claim for relief for fraud under Missouri law, because the claim is based on the same conduct by CenturyLink that does not constitute a breach of the parties' Agreement. The Court will grant CenturyLink's motion to dismiss Count II for failure to state a claim upon which relief can be granted, and does not address the other arguments it makes in support of dismissal.

## IV.  Conclusion

For the foregoing reasons, the Court concludes that plaintiff OS33's complaint fails to state a claim upon which relief can be granted, except as to the declaratory judgment/breach of contract claim in Count I based on defendant CenturyLink's termination of Services and imposition of Early Termination Charges under the parties' Agreement, after plaintiff asked to withdraw its request for early termination. Defendant CenturyLink's motion to dismiss will therefore be granted in part and denied in part.

Accordingly,

**IT IS HEREBY ORDERED** that defendant CenturyLink Communications, L.L.C.'s motion to dismiss is **GRANTED in part** and **DENIED in part**; the motion is **DENIED** as to plaintiff's declaratory judgment/breach of contract claim in Count I based on defendant CenturyLink's termination of Services and imposition of Early Termination Charges under the parties' Agreement after plaintiff asked to withdraw its request for early termination, and **GRANTED** in all other respects.  [Doc. 13]

An appropriate order of partial dismissal will accompany this Memorandum and Order.


_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this  17th  day of May, 2018.